488 P.2d 51

**COUNTY OF YUMA and the Department of Property Valuation of the State of Arizona, Appellants,**

**v.**

**Clifford N. TONGELAND and Evelyn C. Crow, Appellees.**

**No. 1 CA–CIV 1492.**

Court of Appeals of Arizona, Division 1.

Aug. 30, 1971.

238

Gary K. Nelson, Atty. Gen., by Leonard M. Bell, Asst. Atty. Gen., Phoenix, for appellants.

Rolle, Jones & Benton, by Waldo W. Israel, Yuma, for appellees.

KRUCKER, Chief Judge.

The appellees, plaintiffs below, own a parcel of property located at the corner of Fourth Avenue and Fourteenth Street in the City of Yuma. The property is leased to an oil company for use as a service station and the oil company owns the improvements on the property.

For the year 1969, the property, exclusive of improvements, was valued by the Yuma County Assessor at $53,900. Plaintiffs paid their taxes under protest and appealed to superior court. Their position was that the value of the subject property was $18,000. The matter was heard by the court sitting without a jury, and judgment was subsequently entered reducing the actual cash value of the plaintiffs' property to $35,900. This appeal followed.

The following questions are presented:

"A. Did the failure of the trial court to make findings of fact and conclusions of law constitute reversible error?

B. Did the trial court have jurisdiction to change the value of the subject property?"

Although a request for findings of fact and conclusions of law was timely made, the trial court did not comply with the request. However, we need not address ourselves to the effect of such failure since we are of the opinion that the trial court erred in denying the State's "motion for a directed verdict" at the close of the plaintiffs' case.

In the recent Arizona Supreme Court decision in Navajo County v. Four Corners Pipe Line Company, 106 Ariz. 511, 479 P.2d 174 (1970), rehearing denied, 107 Ariz. 296, 486 P.2d 778 (filed April 16, 1971), the court held that in the absence of sufficient competent evidence to support a finding that the value placed on the property by the Department of Property Valuation was inequitable or excessive, such value must stand as "correct and lawful."

■ We agree with the proposition that the income or rental value of real

property is one of the factors affecting its market value and is therefore to be considered in determining its value for tax purposes. Bade v. Drachman, 4 Ariz.App. 55, 417 P.2d 689 (1966); Annot., 96 A.L.R.2d 666; 51 Am.Jur. Taxation §§ 703-705. Income or earnings, however, is not the only element to be considered nor the controlling element in determining the valuation of realty for tax purposes. Annot., 96 A.L.R. 2d 666 § 5 and cases cited therein. As pointed out in the case of Rowland v. Tyler, 5 S.W.2d 756 (Tex.1928):

> "It cannot be doubted that the amount of rental a particular piece of property produces is an important element to be considered in fixing the value of that property. It is likewise true that there are a number of other elements which necessarily enter into the value of any particular piece of property, such as original cost, location, cost and character of improvements, rental history, location as to future growth of the city, sales of adjacent property, etc. * * * In many instances, the amount of rentals would be wholly misleading as applied to value, and a value fixed solely by such method would not approximate the real value. Long-time rental contracts may be made in boom times or in times of depression, and if the amount of rental under such contracts were made the sole and determinative factor in fixing the value of the property covered thereby, the valuation arrived at by such plan would not represent a fair value either to the city or to the taxpayer. Again, many rental contracts are excessive because of bad business judgment on the part of the lessee, and for this reason could not properly be used as the decisive and controlling factor in fixing the values."
> 5 S.W.2d at 760.

In the case at bench, the substance of the taxpayers' evidence was all to the same effect—that the value of the property could be determined only by its net return. Mr. Tongeland, when asked as to his opinion of the value of the property, responded:

> \* \* \* \* \* \*
>
> "A. From the returns which a purchaser would naturally look at I would say around $18,000."

Mr. Tongeland testified that for the year 1969, the net income of the subject property was $1,764. This figure was computed by deducting the real estate taxes from the annual income received from Union Oil as rental. When asked how he computed the value of $18,000 as the value of his property, he stated:

> \* \* \* \* \* \*
>
> "A. Well, most businessmen would expect a return of ten percent on a piece of property they were buying.
>
> Q. How do you base that most businessmen would expect ten percent return on that property?
>
> A. I have been in business for some time and I know numerous other businessmen. I don't know of any businessmen today that would buy a piece of property that wouldn't give them a return of ten percent."
>
> \* \* \* \* \* \*
>
> "Q. So, you took the net income and a ten percent rate against that?
>
> A. For instance, the State, its appraisal of $54,000, we would expect to get a $5,400 income."

The following testimony was elicited from the taxpayers' other witness:

> "Q. And what is your opinion as to that value?
>
> A. I place the value of that property to be $18,000.
>
> Q. Mr. Crow, what factors did you look into to determine this market value of this particular piece of property?
>
> A. Well, I looked at it at the present use of the property today and the area seems to have been downgraded somewhat going north of 16th Street. I looked at it from the ultimate value of the property when the traffic will some day be taken away from it and the main part of my valuation was that the income

approach of the property only gives about ten percent income net, for the valuation.

Q. Now, Mr. Crow, after you collect and appraise all this information that you have just testified to, how do you calculate the market value of the property?

A. The way you ultimately get an answer on that is what somebody—if you put the property us to sale, who would buy it for such price—for a given price so that they get a fair return on their investment.

Q. Is this what is technically called the income approach?

A. Income approach, yes.

Q. And how is this income or this rental income indicative of the property value? I believe you have testified—already stated it, but I wasn't certain as to your answer.

A. From the net result of what your gross income is minus whatever you were putting out and in this particular instance, it was the real estate tax.

Q. Now you mentioned the ten percent rate, Mr. Crow. How did you determine this ten percent? Is it flexible or is it something—

A. I think on a piece of property you ought to receive a little more than what you could get at the bank—a good blue chip stock would give you anywhere from five to seven percent. So, you have the hazards of many factors here that you might not see down the road a piece. You might not get ten percent all the time. As an investor I think you ought to start in and at least get that much because you can't just go to the bank and say I want to cash this in. You have got to find some buyer to come along and take it out of your hands if you wanted cash.

Q. In other words if the buyer was going to come in and purchase this property he would look to the return of income on the property?

A. That's the only way I'd like to make an investment."

He testified on cross examination:

"Q. I think you testified as to one method which you considered to be correct in ascertaining the value of what a buyer would pay for that piece of property. Would you consider any other methods to be acceptable in computing that value?

A. At the present time I don't think so. I think the purchaser is going to look at the net results of what he's going to receive from his investment and the future doesn't look too bright right in this particular area right at the present time."

He further testified he would not consider comparable sales because the subject property was "tied up" with a lease and he gave no consideration to the fact that the property would ultimately revert back to its owner.

In the case of Miller Investment Co. v. Board of Commissioners of Sedgwick County, 151 Kan. 246, 98 P.2d 109 (1940), a case involving service station property, the taxpayer's theory of attack on the assessor's valuation was the same as in the case at bench. In other words, that the only true test of value was the net return to the owner of the property. The Kansas Supreme Court affirmed the trial court's judgment dismissing the case at the close of the plaintiff's evidence. The court stated:

"The allegations in plaintiffs' petition charging defendants acted arbitrarily, capriciously, and in a manner to constitute a fraud upon plaintiffs is supported only by evidence tending to show that the assessor and his deputy did not follow the theory of plaintiff respecting the method, or the sole method, of determining the value of their property, but on the other hand that they followed our statutes, above quoted, to the best of their knowledge and ability. This was their duty. [Citation omitted.] We think it clear [that] plaintiffs' allegations in these respects were not sustained by the evidence." 98 P.2d at 110.

We believe the plaintiffs here did nothing more than show that the Depart-

ment of Valuation did not follow their theory that the sole method of determining the value of their property was the net return to them. A mere difference of opinion as to the method to be used in computing valuation does not justify judicial intervention in the area of taxation. Navajo County v. Four Corners Pipe Line Co., supra. Since the plaintiffs failed to establish affirmatively their contention that the assessment was excessive, the trial court erred in substituting its opinion for that of the taxing authority.

Judgment reversed with directions to enter judgment that plaintiffs take nothing by their complaint.

HATHAWAY and HOWARD, JJ., concur.

NOTE: This cause was decided by the Judges of Division Two as authorized by A.R.S. § 12–120, subsec. E.