709 P.2d 573

**INSPIRATION CONSOLIDATED COPPER COMPANY, Plaintiff-Appellee,**

v.

**The ARIZONA DEPARTMENT OF REVENUE; and Gila County, Defendants-Appellants.**

**No. 1 CA–CIV 6603.**

Court of Appeals of Arizona, Division 1, Department A.

Sept. 19, 1985.

Lewis & Roca by John P. Frank, Douglas L. Irish and Patrick Derdenger, Phoenix, for plaintiff-appellee.

Robert K. Corbin, Atty. Gen. by James P. Winter, Asst. Atty. Gen., Phoenix, and Little, Fisher, Bromley & Siegel, P.C. by Barbara E. Fisher, Sp. Asst. Atty. Gen., Tucson, for defendants-appellants.

## OPINION

HAIRE, Presiding Judge.

This is an appeal by the Arizona Department of Revenue (Department) and Gila County from a superior court judgment which held that Inspiration Consolidated Copper Company (Inspiration), was entitled to a tax refund because the valuation established by the Department for Inspiration's producing copper mine near Miami, Arizona was excessive. The Department's valuation, which was affirmed by the State Board of Tax Appeals, set the 1980 full cash value for the mine at $49,000,000. After a three and one-half week trial, the superior court found that the Department's valuation was excessive, found the actual full cash value to be $28,874,000 and accordingly entered judgment in the taxpayer's favor ordering a refund of excess taxes paid under protest.

## SCOPE OF SUPERIOR COURT REVIEW

Because the resolution of many of the specific issues raised on appeal depends upon the scope of the superior court's review, we will first address the standards which govern the superior court when it sits on an appeal from a valuation of property by the appropriate valuation authority.

The Department contends that the superior court's authority is very narrow, essentially limited to the "abuse of discretion" standard normally applied to the review of administrative agency decisions pursuant to Arizona's Administrative Review Act,

A.R.S. § 12–901, et seq. It argues that relief cannot be granted unless the superior court first finds that the Department's appraisal is fraudulent, illegal, arbitrary or capricious or constitutes "a pure fiction." Inspiration, referring to the governing statutes, replies that the superior court's authority on appeal extends far beyond a mere "abuse of discretion" review, and that, unlike some jurisdictions, under Arizona law the superior court has extremely broad authority when it sits on an appeal from the valuation of property for *ad valorem* tax purposes.

The statutory provisions relating to the superior court's authority on a valuation appeal are relatively straight-forward and clear. A.R.S. § 42–146 provides that any taxpayer dissatisfied with a tax valuation as reviewed by the State Board of Tax Appeals may appeal to the superior court in the manner provided by A.R.S. § 42–151. A.R.S. § 42–151 provides for the commencement of the action by the filing of a notice of appeal in the superior court. The notice of appeal must contain a statement of the reasons why the valuation is excessive. Additionally, all taxes assessed against the property must be paid under protest prior to the date the tax becomes delinquent. Under A.R.S. § 42–152(B), on appeal both parties may present evidence of any matters that relate to the full cash value of the property as of the date of its assessment. The appeal is not heard on the record presented before either the Department or the Board of Tax Appeals, but rather on the evidence presented by the parties. Therefore, the appeal is a trial *de novo* in the true sense. *See Navajo County v. Four Corners Pipe Line Co.*, 107 Ariz. 296, 486 P.2d 778 (1971).

The statute also provides that the valuation as approved by the appropriate state or county authority "shall be presumed to be correct and lawful." As to the relief which the taxpayer can obtain in the superior court, A.R.S. § 42–152(C) provides that if, after hearing the evidence the superior court finds that the valuation is excessive, the court shall then find the full cash value

of the property and order a refund of excess taxes paid.

The cases which have directly addressed the nature of the statutory presumption have consistently held that it is simply one of fact, and that whenever evidence contradicting the presumption is received, the presumption disappears. *Graham County v. Graham County Electric Cooperative, Inc.*, 109 Ariz. 468, 512 P.2d 11 (1973); *Department of Property Valuation v. Trico Electric Co-Op, Inc.*, 113 Ariz. 68, 546 P.2d 804 (1976); *State Tax Commission v. Phelps Dodge Corporation*, 62 Ariz. 320, 157 P.2d 693 (1945); *Honeywell Information Systems, Inc. v. Maricopa County*, 118 Ariz. 171, 575 P.2d 801 (App.1977); *Department of Revenue v. Transamerica Title Ins. Co.*, 117 Ariz. 26, 570 P.2d 797 (App.1977); *Department of Property Valuation v. Salt River Project Agricultural Improvement and Power District*, 27 Ariz. App. 110, 551 P.2d 559 (1976).

In *Golder v. Department of Revenue*, 123 Ariz. 260, 599 P.2d 216 (1979), Justice Hays points out that in order to rebut the presumption, the taxpayer must present *competent* evidence, and that where the taxpayer presents evidence based upon different methods of assessment than those used by the state, the taxpayer's evidence is not competent unless the taxpayer can demonstrate that the appraisal methods used are appropriate under the circumstances.[1] Where both the state and the taxpayer's valuation experts use the same method of appraisal, but differ as to the correct treatment of factors utilized in such method, the taxpayer's evidence is nevertheless competent and sufficient to overcome the statutory presumption. As stated by Justice Holohan in *Trico, supra:*

"We do not believe that this difference in approach affects the *competence* of [the taxpayer's expert] testimony. Rather, it is a factor that the jury must weigh in its analysis of the conflicting testimony.

We therefore hold that [the taxpayer's expert] testimony contained substantial competent evidence of full cash value and of the excessiveness of the valuation of *Trico.*" 113 Ariz. at 70, 546 P.2d at 806 (emphasis added).

The evidence which overcomes the statutory presumption and which the court considers in determining that the state's valuation is excessive is to be presented in a single trial *de novo* and may also be a part of the evidence which the court uses to thereafter determine the new full cash value for the property. *Trico, supra; Navajo County v. Four Corners Pipe Line Company*, supplemental opinion on rehearing, 107 Ariz. 296, 486 P.2d 778 (1971); *Phelps Dodge, supra; Transamerica, supra.*

From the foregoing discussion it is apparent that in reviewing a tax valuation the superior court is given broad *de novo* authority. The trial court is restricted only by the requirement that it must first conclude, based upon evidence of valuation derived from standard appraisal methods and techniques, that the statutory presumption has been overcome and that the taxing authority's valuation is excessive. Once these prerequisites have been established, the trial court then proceeds to consider the evidence and make a decision as to the appropriate new full cash value of the property. We find nothing in the statutory scheme or in the cases discussed above which speaks in terms of the narrow scope of superior court review urged by the state.

In fairness to the Department, however, we must acknowledge that there are several Arizona tax decisions which seemingly ignore the broad scope of review established by the Arizona statutes and either directly or indirectly furnish support for the narrow scope of review urged by the Department. *See Mohave County v. Duval Corporation*, 119 Ariz. 105, 579 P.2d

---

1. Under A.R.S. § 42–201(4), full cash value is synonymous with market value and must be established by "standard appraisal methods and techniques." Market value is the cash price for which the property would sell in an arms-length transaction between a willing buyer and a willing seller. *Golder, supra; Honeywell Information Systems, Inc., supra; Transamerica Title Insurance Co., supra.*

1075 (1978); *Pima County v. Cyprus-Pima Mining Company,* 119 Ariz. 111, 579 P.2d 1081 (1978); *Pesqueira v. Pima County Assessor,* 133 Ariz. 255, 650 P.2d 1237 (App.1982); *Rancho Del Oro Apartment Co. v. State,* 119 Ariz. 137, 579 P.2d 1107 (App.1978); *County of Maricopa v. North Central Development Company,* 27 Ariz.App. 561, 556 P.2d 1164 (1976). Thus, we are presented with two lines of case law regarding the scope of the superior court's authority on a property valuation review. The rationale of one line establishes a broad scope of review, while the rationale of the other line supports a much more restricted scope of review.

Historically, it appears that prior to 1970 the Arizona decisions unanimously held that the superior court exercised a broad scope of review on appeal from a valuation imposed by Arizona taxing authorities. *See e.g., State Tax Commission v. Phelps Dodge Corporation,* 62 Ariz. 320, 157 P.2d 693 (1945). ("This section requires an independent and original inquiry [by the superior court] into the matters affecting valuation in that it expressly authorizes the trial court to consider 'evidence of any matters that relate to the full cash value of the property' and directs that 'Should the court find that the assessment is excessive, then the court shall find the full cash value of the property, and render judgment for appellant and against the county.'" 62 Ariz. at 322, 157 P.2d at 694.); *State Tax Commission v. United Verde Extension Mining Co.,* 39 Ariz. 136, 4 P.2d 395 (1931); *State Tax Commission v. Magma Copper Co.,* 41 Ariz. 97, 15 P.2d 961 (1932).

The split in Arizona decisional law appears to have developed as a result of the differences between the rationale advanced by the Arizona Supreme Court in its initial decision in *Navajo County v. Four Corners Pipe Line Company,* 106 Ariz. 511, 479 P.2d 174 (1970), and the rationale finally adopted by the court in its supplemental opinion on rehearing, 107 Ariz. 296, 486 P.2d 778 (1971). The rationale expressed by the court in its initial decision was consistent with a very narrow scope of superior or court review. Thus, in its initial decision, the court stated:

"It is the opinion of this Court that the focus of the evidence in the court below should have been directed to the question of whether the method of assessment used by the Department of Property Evaluation was fundamentally unfair, arbitrary, fraudulent, or equitably excessive."

106 Ariz. at 519, 479 P.2d 174.

and

"The State attacked the 'wasting asset' method as being speculative but the Company did not counter with evidence that the Department's method was fraudulent, illegal, arbitrary, capricious or inherently unfair—and this is the crux of the matter."

106 Ariz. at 520, 479 P.2d 174.

Additionally, the court stated:

"To repeat, it is not the function of the judiciary to promulgate tax assessment regulations in the form of judicial opinions. The court's function in this area of taxation is the same as in the other traditional areas of administrative law; that is to review the actions of such administrative bodies and to superimpose its opinion only in the event that the agency abused its legislatively-delegated duty."

106 Ariz. at 522, 479 P.2d 174.

And finally,

"Since there was no finding by the trial court, nor sufficient evidence introduced to support a finding, that the Department employed an inherently unjust or inequitable method of evaluation, it is the opinion of this Court that the Superior Court exceeded its jurisdiction in substituting its method of evaluation for that of the Department."

106 Ariz. at 522–523, 479 P.2d 174.

After the issuance of its initial decision it appears that the *Four Corners* court received and reviewed the briefs of many *amici curiae* filed in support of the taxpayer's petition for rehearing. The court then issued a supplemental opinion in which it in effect disavowed the narrow scope of review set forth in its initial decision, and

returned to the broad scope of review set forth in the pertinent statutes, and previously approved by the Arizona courts. Thus, in the supplemental opinion, the court stated:

"The various terms such as 'arbitrary, fraudulent, capricious, fundamentally unfair, equitably excessive' were employed in the opinion, in their context of cited cases, in order to give the background and the principles of law used by courts of other jurisdictions in passing upon tax evaluations assessed by the taxing authorities in those states. *None of those terms were imported into our statute.*" (Emphasis added).

107 Ariz. at 297–98, 486 P.2d 778.

The court also noted that because of the statutes, Arizona's trial courts had more jurisdiction than the cases referred to in its initial opinion. The court then stated:

"The real test in the instant case is whether there was competent evidence sufficient for the superior court to find that the valuation, as fixed by the Department was 'excessive.' It is for this Court to determine, on appeal, whether the trial court's decision was based on competent evidence sufficient to substantiate the finding, and, if so, then the superior court was proper in fixing it [sic] own valuation."

107 Ariz. at 299, 486 P.2d 778.

The state in opposition to the petition for rehearing in *Four Corners* pointed out the dangers inherent in statutes having a broad scope of review, as follows:

" * * * to decide a very high portion of the litigated cases in favor of the taxpayer. * * * Under a broad rule of judicial review, the goal of equalization would be doomed by the differences in opinions as to value of over 50 Superior Court judges. Under a narrow scope of judicial review, equalization is feasible because most of the valuation questions will be decided by a single body, the State Board of Property Tax Appeals, and the Superior Court's scope of review of those decisions would be limited."

107 Ariz. at 300, 486 P.2d 778.

In response to this argument, the court stated:

"While this interpretation might be desirable in that it might prevent different methods being adopted by different courts throughout the State in evaluation of the same kind of property, that is not the procedure set forth by the state under the statute. It was for this reason that we discussed in detail the problems that have arisen in the courts in the field of property taxation. The legislature may in its wisdom wish to follow the recommendations of the State and narrow the scope of review, but. that is a question for its determination and not for this Court."

*Id.*

Unfortunately, the Arizona Supreme Court did not vacate that portion of its initial decision which was inconsistent with the broad scope of review finally adopted in its supplemental opinion on rehearing. As a result, a line of authority has developed which espouses a narrow scope of review, based primarily upon the rationale set forth in the initial *Four Corners* decision. Thus, in *Duval Corporation,* 119 Ariz. 105, 579 P.2d 1075, with Justice Cameron dissenting, the court referred to the initial decision:

"We said in *Navajo County v. Four Corners Pipe Line Company,* 106 Ariz. 511, 479 P.2d 174 (1970), that a trial court in reviewing the action of the Board of Tax Appeals may superimpose its opinion only in the event that the State agency abused its legislatively-delegated duty. And we pointed out that a taxpayer is not entitled to relief because the value of his property would be fixed substantially lower if computed by a different method, even if the court thought such method to be preferable. * * * Since the court may not fix the value of property at a substantially lower amount even though the court thinks the taxpayer's method is preferable to the one adopted by the taxing authority and courts will not give relief against an assessment on account of mere differences of opinion, the judg-

ment of the Superior Court is reversed and the valuation as fixed by the Board of Tax Appeals is affirmed."

119 Ariz. at 111, 579 P.2d 1075.

In *Cyprus-Pima Mining Company,* 119 Ariz. 111, 579 P.2d 1081, the court, again referring to the initial *Four Corners* decision, stated:

"We have said that a mere difference of opinion as to the method to be used in computing valuation does not justify judicial intervention in the area of taxation. *Mohave County v. Duval Corp., supra; Navajo County v. Four Corners Pipe Line Company,* ·106 Ariz. 511, 479 P.2d 174 (1970), rehearing denied, 107 Ariz. 296, 486 P.2d 778 (1971). And see *County of Yuma v. Tongeland,* 15 Ariz.App. 237, 488 P.2d 51 (1971). If a difference of opinion as to the method of computation does not justify judicial intervention, then clearly a difference in result arrived at by use of a different method cannot alone justify intervention."

119 Ariz. at 115, 579 P.2d 1081.

Similarly, in *Rancho del Oro,* 119 Ariz. 137, 579 P.2d 1107, in *Pesqueira,* 133 Ariz. 255, and in *North Central Development Co.,* 27 Ariz.App. 561, 556 P.2d 1164, the court of appeals held that the superior court's review was limited to an "abuse of discretion" standard, citing as authority the Arizona Supreme Court's initial *Four Corners* decision in 106 Ariz. 511, 479 P.2d 174.

In fact, in each of the post-1970 Arizona decisions which has adopted a narrow scope of review, the court has relied on the scope of review rationale set forth in the Arizona Supreme Court's initial decision in the *Four Corners* litigation. As demonstrated above, that rationale was disavowed in the court's supplemental opinion on rehearing. We further note that each of the post-1970 decisions which has applied a broad scope of review has directly or indirectly relied on the scope of review rationale adopted by the *Four Corners* court in its supplemental opinion on rehearing.

In considering which line of authority this court should follow, it appears that the latest opinion of the Arizona Supreme Court which touches on this issue, *Golder,* 123 Ariz. 260, 599 P.2d 216, did not adopt the statements in *Cyprus-Pima,* 119 Ariz. 111, 579 P.2d 1081 and *Duval Corporation,* 119 Ariz. 105, 579 P.2d 1075, that mere differences of opinion as to the appropriate method of evaluation or differences as to the methods of computation will not justify judicial intervention. Rather, the *Golder* court recognized that the taxpayer may rely upon different methods of assessment than those made by the state, as long as the taxpayer shows that the appraisal method it used was appropriate under the circumstances. Likewise, in *Trico,* 113 Ariz. 68, 546 P.2d 804, the Arizona Supreme Court recognized that when the taxpayer uses the same method of appraisal as that used by the state, but merely uses a different method of computing a factor involving depreciation, the taxpayer's expert evidence constituted substantial competent evidence of full cash value and of the excessiveness of the department's valuation.

In our opinion the line of cases which ascribe a broad scope of superior court review in tax valuation appeals more accurately reflects the Arizona statutory scheme. Therefore, we reject the Department's contentions that the superior court's review in tax valuation cases is the same as in other traditional areas of administrative law. We also specifically reject the Department's contention that the superior court can disapprove the Department's valuation and impose its own valuation only upon a finding that the Department "abused its discretion," or "abused its legislatively delegated duty." Similarly, there is no requirement that there be a showing by the taxpayer that the Department's valuation was fraudulent, illegal, arbitrary, capricious or inherently unfair. Rather, under Arizona's statutory scheme, if the trial court finds that the Department's valuation is excessive, it may then proceed to find a new full cash value.

In determining whether the Department's valuation is excessive, the Department is initially aided by the statutory presumption that its valuation is correct and lawful. However, as previously discussed, this presumption disappears if competent valuation evidence is presented by the taxpayer. Evidence is competent for the purposes of rebutting the statutory presumption and of showing that the Department's valuation was excessive when it is derived by standard appraisal methods and techniques which are shown to be appropriate under the particular circumstances involved. Appraisal evidence is competent even though it is based on a different method of appraisal than that utilized by the Department, as long as the method used is shown by expert testimony to be a standard method of appraisal. Likewise, appraisal evidence is competent which, even though based upon the same method of appraisal as that utilized by the Department, disputes the correctness of the computation of the various elements used in the particular method of appraisal.

It might well be, as argued by the state on rehearing in *Four Corners*, that this broad scope of superior court review is inconsistent with tax equalization goals and is therefore unwise from a policy standpoint. However, as stated by the Arizona Supreme Court in its supplemental opinion on rehearing in *Four Corners*, that is a question for determination by the legislature.

Turning now to the issues presented on this appeal, because we reject the narrow scope of superior court review urged by the Department, we find that Inspiration introduced competent appraisal evidence which was sufficient to support the trial judge's finding that the statutory presumption had been rebutted and that the Department's valuation was excessive. Before proceeding with a discussion of that evidence, we consider an issue raised by the Department concerning the appropriate as- sessment date for use in the valuation of a producing mine.

## THE VALUATION DATE

The Department contends that the trial judge erred when he ruled that evidence relating to the valuation of Inspiration's producing mine for the year 1980 was admissible if it was known or knowable by the third Monday in June 1980. The Department urges that January 1, 1980, should have been the cut-off date. The quarrel between the parties arises because A.R.S. § 42-124(A) did not expressly provide for a specific valuation date as did most other taxing statutes in effect at that time. *See, e.g.*, A.R.S. §§ 42-221, 42-124(B), 42-124.01(C)(5) and 42-124.01(E), (F) and (I).

The legal arguments advanced by the parties present a close question on this issue. However, we find no reason to decide the issue in this case. First, we note that in 1983 the legislature amended A.R.S. § 42-124 by adding a new subsection expressly providing that "[t]he valuations required by this section are the values determined as of January 1st of the tax year." § 42-124(E). Therefore, any determination which we might make relating to the valuation date requirements of the pre-1983 statute would be of limited precedential value. More importantly, however, we note that after the state presented six pages of legal argument in an attempt to persuade this court that January 1, 1980 was the legally correct valuation cut-off date, the Department failed to point out to the court with any specificity or transcript reference how the Department was prejudiced by the allegedly erroneous trial court ruling. All that the Department says in this regard is the following:

> "Inspiration's experts used for their data primarily documents which came into existence in February through May of 1980. Consequently these documents were inadmissible as was the expert testimony based on their use." [2]

2. The Department's briefs filed in this appeal were defective in many aspects. The superior court trial covered approximately three and one-half weeks of trial time resulting in a tran-

Inspiration responds that the trial court ruling setting the cut-off date for the third Monday in June 1980 was legally correct, and additionally urges that even though one of its appraisal witnesses did use a computer printout document which bore a February 1980 date, the testimony was undisputed that all data contained in that document was known or knowable as of January 1, 1980. Therefore, Inspiration concludes, even if we accept the Department's argument that January 1, 1980 was the legally correct cut-off date, the evidence actually used was in existence on that date. The Department has not responded to this argument. This court has no obligation to independently search the record in order to determine the factual validity of issues raised on appeal when the party raising the issues has not provided the court with record references in support of the issue as required by the appellate rules. *Tovrea Land & Cattle Co. v. Linsenmeyer*, 100 Ariz. 107, 412 P.2d 47 (1966); *Spillios v. Green*, 137 Ariz. 443, 671 P.2d 421 (App.1983).

Accordingly, we refuse to give further consideration to the Department's allegation of error concerning the trial court's ruling relating to the valuation cut-off date. We consider next the question of whether there was competent evidence to rebut the statutory presumption that the Department's valuation was correct and lawful.

## EVIDENCE REBUTTING THE STATUTORY PRESUMPTION

▪ Some background information is essential to an understanding of the specific arguments raised by the parties relating to this issue. As previously stated, the Department had determined that the full cash value for Inspiration's producing mine was

$49,000,000. In arriving at that valuation, the Department apparently used appraisals based not only on the income approach, but also on the cost and market data approaches to value. The Department's briefs do not explain how the specific valuations arrived at by each of the separate valuation techniques were utilized by its appraiser, or how the ultimate valuation of $49,000,000 as derived from the three separate appraisal approaches.

Inspiration presented at trial appraisal evidence based on variations of the income method of appraisal only. It did not present any appraisals based on the market data or cost approaches, but did present evidence which attacked both the propriety of the use and the correctness of the appraisals resulting from the market data and cost approaches used by the Department.

The method used by the Department in its income appraisal was a form of capitalization of future income using a "five-year historic margin" applied to the life of the mine, and then reduced to present value by applying the "Hoskold" formula for discount purposes. Valuations based on the use of this method by the Department have been affirmed by the Arizona Supreme Court in *Duval*, 119 Ariz. 105, 579 P.2d 1075, and *Cyprus-Pima*, 119 Ariz. 111, 579 P.2d 1081. Some of Inspiration's appraisal evidence was also based upon the five year historic margin—Hoskold approach, but its primary emphasis was on an approach known as a discounted cash flow analysis using a single capitalization rate for discount purposes.

In order to rebut the statutory presumption that the Department's valuation was correct, Inspiration presented four types of evidence:

script of over 2,500 pages. Most of the issues raised on appeal involve attacks upon the sufficiency of the evidence of various expert appraisal witnesses presented by Inspiration and require this court to consider this evidence as well as appraisal evidence submitted by the Department. Yet, no record or transcript references are included in the statement of the case or the

statement of facts included in the Department's opening brief. *See* Rule 13(a)(4), Arizona Rules of Civil Appellate Procedure. In fact we find only four transcript references in the entire opening brief. We note that the briefs were not prepared by the attorney who represented the Department at oral argument before this court.

(1) Expert testimony that knowledgeable purchasers of producing mines on the open market do not base their purchase decisions on the cost or market data approaches to value, but rely on a capitalization of future income approach;

(2) Expert testimony that the capitalization of future income approach used by the Department, i.e., the five year historic margin method applying the two rate Hoskold discount premise was obsolete and no longer used by purchasers, mining companies, financial institutions or competent mine investment analysts;

(3) Expert evidence showing errors in factual premises and techniques committed by the Department leading to excessive valuation in its various appraisal approaches; and

(4) Expert appraisal testimony by Inspiration witnesses using a discounted cash flow analysis with a single capitalization rate, arriving at valuations significantly lower than that determined by the Department.

After hearing all the evidence the trial judge expressly found that it had received evidence which had rebutted the statutory presumption accorded to the Department's valuation. The Department has attacked the sufficiency of the evidence to support this finding, speaking in broad, general terms, unsupported by any record or transcript references to aid the court in considering its arguments.[3] Most of the Department's arguments on this issue are based upon its misconception of the superior court's scope of review as being extremely narrow in tax valuation appeals. We have previously demonstrated the Department's error in that regard, and therefore reject the Department's argument. Review is not on an abuse of discretion basis, nor was Inspiration required to show that the Department's appraisals were based on "pure fiction" in order to rebut the statutory presumption. Furthermore, Inspiration's evidence was not incompetent because it showed "mere differences of opinion" as to the appropriate methods of valuation or that if computed by a different method the valuation would be substantially lower.

Based upon the briefs presented on this appeal and based upon our review of the transcript of the trial court proceedings, we are convinced that the trial judge's finding that the statutory presumption was rebutted was based upon competent and substantial evidence. The various expert witnesses testified as to their qualifications and that the appraisal methods they espoused were based upon standard appraisal methods. In fact, there was no testimony that the appraisal methods used by Inspiration's appraisers were not based upon standard appraisal methods and techniques. When the trial judge hears the expert appraisal witnesses, he is best able to judge their credibility and the accuracy and effectiveness of their application of appropriate techniques in arriving at a final valuation. *See Magna Investment and Development Corp. v. Pima County,* 128 Ariz. 291, 625 P.2d 354 (App.1982). Under such circumstances, we will not disturb his conclusions.

There was substantial competent evidence rebutting the correctness of the Department's valuation on many bases, and we will not attempt to discuss all of the evidence in this already lengthy opinion. We will, however, comment on some of the more important aspects of that evidence. First, as to the Department's income approach there is overwhelming evidence in the record from which the trial judge could have concluded that the Department improperly adjusted the margin obtained by application of the "five year historic margin" approach. After calculating a five year historic margin by application of its normal techniques of less than one cent (.98 cents) per pound of copper produced, the Department adjusted that margin up-

---

**3.** The Department's opening brief does contain two transcript references relating to the testimony of Inspiration's expert appraisal witness Nichols. We consider these references to be primarily pertinent to an issue to be discussed later in this opinion relating to the sufficiency or competency of Inspiration's evidence to support the new full cash value set by the trial court.

ward to reflect what it foresaw as an increase in future profitability of the mining operation. That adjustment was not minimal, but rather reflected as estimated increase of approximately 704%, resulting in a profit increase ranging from five to seven cents per pound of copper greater than the five year historical margin determined by the Department. This adjustment resulted from the Department's interpretation of information included in Inspirations's tax report [4] to the Department, and will be referred to as the "stripping ratio adjustment." The overwhelming weight of the evidence supports Inspiration's contention that the Department's stripping ratio adjustment was unwarranted and improper. Without going into detail, evidence was presented showing that Inspiration's projection of a future stripping ratio lower than its past stripping ratios was primarily a result of a redefinition of terms by Inspiration as to what constitutes "ore" and what constitutes "waste" in a given amount of material being moved.[5] This redefinition resulted from the adoption by Inspiration of a new recovery process (called "ferric cure"), pursuant to which material previously considered waste would in the future be considered ore. While the change in stripping ratio might well initially have been somewhat misleading to the Department in that it created an illusion of a major reduction in future mining costs, there is strong evidence from which the trial judge could have concluded that the Department's adjustment was improper in view of Inspiration's explanation of the change, and that the Department's resulting appraisal was incorrect and substantial-

ly excessive. This evidence alone would have justified the trial judge's conclusion that the statutory presumption that the Department's valuation was correct had been rebutted. Therefore, although other evidence was also introduced which further impeached the valuation resulting from the Department's income approach, we need not discuss it in this opinion.[6]

## THE TRIAL JUDGE'S FINDING OF EXCESSIVENESS

We turn next to the trial judge's finding that the Department's valuation was excessive. Inspiration presented evidence challenging each of the three methods used by the Department in its valuation.

We have previously discussed the two variations on the income approach to value presented in this case: the five year historic margin—Hoskold formula approach and the discounted cash flow analysis approach. Both of these approaches involve a capitalization of future income method. The major differences are 1) the discounted cash flow analysis approach uses a single discount rate rather than the two discount rate Hoskold formula method, and 2) the five year historic margin method focuses primarily on history to establish future profits whereas the discounted cash flow analysis focuses on projected future cash flow and the profits which can be derived therefrom.

The income approach used by the Department was a variation of the five year historic margin—Hoskold formula approach. When considered in connection with the Department's market data and cost ap-

---

4. The "tax report" is a report required by the Department to be submitted annually by the taxpayer. The information contained in the report forms a partial basis for the Department's determination of value.

5. In mining terminology the term "stripping ratio" refers to the proportion of waste material to ore in a specified amount of material moved. If the proportion of waste to ore (the stripping ratio) is low, the result is greater profitability, since it is necessary to remove less waste for a given amount of ore.

6. Since we hold in this opinion that there is substantial evidence from which the trial judge could have found that the Department's appraisal was incorrect, we have not considered Inspiration's further contention that the valuation was not lawful because of the Department's failure to adopt the standard appraisal methods and techniques required by A.R.S. § 42–123(A) in accordance with the procedures set forth in the Administrative Procedure Act, A.R.S. § 41–1001, et seq., governing the adoption of agency rules and regulations. Our failure to consider this issue is not to be considered as an indication that the issue has no merit.

praisals, the Department's resulting full cash value for the mine was $49,000,000. Inspiration presented expert appraisal evidence using both the five year historic margin—Hoskold method and the discounted cash flow analysis method. There was expert witness testimony that the discounted cash flow analysis constituted a standard appraisal technique. Inspiration's evidence was as follows:

(1) Harry Greenfield, Inspiration's tax manager, testified that using the Department's own historic margin methodology, but eliminating the erroneous stripping ratio adjustment utilized by the Department, the resulting valuation would be $26,734,000.

(2) Thomas O'Neil, a former Department chairman and professor at the University of Arizona's School of Mines, was in charge of making mine purchase decisions for AMOCO Minerals, involving contemplated expenditures of some two and one-half billion dollars in the next few years. He testified that, using the Department's own five year margin methodology, but correcting it for errors which he perceived, the indicated full cash value for the mine would be $29,053,000.

(3) Grace Guderjahn, of Stone and Webster Appraisal Corporation, also submitted an appraisal report. The Guderjahn report, like that of Professor O'Neil was highly critical of the Department's income appraisal. After correcting errors which she identified in the Department's approach, she concluded that using the Department's own methodology, the full cash value of the mine was $27,000,000.

(4) William Hawkins, also of Stone and Webster Appraisal Corporation, made an indepent (not using the Department's methodology) appraisal using a discounted cash flow analysis. He concluded that the full cash value of the mine was $31,000,000.

(5) Richard Nichols, Vice-President of American Appraisal Co., also testified as an independent expert appraisal witness using a discounted cash flow analysis.

It was his opinion that the value of the mine was $28,874,000.

After hearing the appraisal evidence and considerable testimony criticizing the use of the five year historic margin—Hoskold approach, the trial judge found as follows:

"The Court finds that the 'single capitalization rate' or 'discounted cash flow analysis' technique is the most reliable technique for valuing producing copper mines for ad valorem tax purposes."

The Department contends that this finding was erroneous, relying on the Arizona Supreme Court's approval of the five year historic margin—Hoskold approach in the *Cyprus-Pima* and *Duval* cases, *supra.* Our reading of these cases reveals that they do authorize the use of the five year historic margin—Hoskold approach under the evidence submitted and the circumstances of those cases. Neither *Cyprus-Pima*, 119 Ariz. 111, 579 P.2d 1081, nor *Duval*, 119 Ariz. 105, 579 P.2d 1075, however, purport to hold that the historic margin—Hoskold approach is the exclusive income valuation method which may be utilized in valuing a producing mine. The trial judge heard all the evidence and decided that based upon the evidence presented to him in this case, the Department's appraisal involving the five year historic margin—Hoskold approach was not as reliable as the appraisals submitted using the single capitalization rate and the discounted cash flow analysis. Indeed, when the totality of the evidence is considered, he could hardly have concluded otherwise.

■ We have already set forth in this opinion evidence which impeached and refuted the Department's methodology in its use of the historic margin—Hoskold approach in this case. The approach was severely criticized by witness O'Neil as no longer being used by any mining company, financial institution or competent mine investment analyst in establishing the value of a mine for an open-market purchase transaction. The Department's own independent appraisal witness testified that he had written that the Hoskold formula tech-

nique used for discount purposes in the valuing of a producing mine was obsolete in terms of modern financial analysis. Finally, the Department's own appraiser who prepared the appraisal report used by the Department in valuing Inspiration's mine for 1980, testified that in his opinion the Department would give up the use of the Hoskold formula in the next few years and would go to a straight rate technique, that the Hoskold formula approach had been written before there were income taxes and attendant depreciation, and that the approach was antiquated and had "lots of problems." In summary, we find that the trial judge did not commit error in finding that the discounted cash flow analysis with a single capitalization rate was more reliable than the historic margin—Hoskold formula appraisal submitted by the Department in this case. In this connection, we note that the discounted cash flow analysis method of appraisal is essentially a method which has been accepted and approved by the Arizona Supreme Court on numerous occasions. *See, e.g., State Tax Commission v. Phelps Dodge Corporation*, 62 Ariz. 320, 157 P.2d 693 (1945); *State Tax Commission v. Magma Copper Co.*, 41 Ariz. 97, 15 P.2d 961 (1932).

As previously mentioned, the Department also used the market data and cost approaches in arriving at a value for Inspiration's producing mine. The market data approach was based upon what the Department characterizes as a sale of "this same mine" in mid-1978. In actuality the Department's reference is to a "tender offer" for a stock purchase pursuant to which the Hudson Bay Mining and Smelting Company acquired essentially the balance of the remaining shares of Inspiration's stock not previously owned by Hudson.

Inspiration's attack upon the market data valuation approach used by the Department was twofold. First, there was substantially uncontroverted evidence that the market data approach is not used by buyers in the open market of producing mines, and thus was an improper appraisal approach. Second, Inspiration attacked the factual soundness of the specific market data approach used by the Department, presenting evidence that:

(1) The "tender offer" price per share used by the Department was not the established market price for the stock, but rather included a premium for control of from 25% to 76% above the stock's traded value;

(2) Rather than actually appraising assets of the corporation other than the producing mine, the Department improperly assumed certain values for these other assets; and

(3) The "tender offer" was stale and not necessarily relevant to 1980 values.

From our review of the evidence, it appears that, separate and apart from the legal question as to whether the market data approach is an acceptable appraisal method for the valuation of a producing mine, the soundness of the Department's use of the tender offer approach in this case was substantially impeached.

In fact, even the Department's own independent appraisal witness, Robert Paschall, was of the opinion that the tender offer purchase by Hudson was too stale to be of any validity as an effective appraisal technique.

The third appraisal method used by the Department in valuing Inspiration's mine was the cost method. The Department's briefs on appeal do not discuss the result of this appraisal method nor raise any specific issues relating thereto. Therefore, our discussion will also be limited in nature. We do note that in attacking the new full cash value established by the trial judge, an argument is made to the effect that the new full cash value determined by the court was inappropriate because it failed to give adequate impact to the substantial investments made in the mine during the two prior years.[7]

7. The testimony of Don Ross, the Department's appraiser, is that during that period "they have invested 27 and a half million dollars or somewhere in that neighborhood."

The Department does not attempt to place this argument in the context of any of the expert appraisal evidence, and, in any event, in view of the trial judge's rejection of the cost approach as a valid appraisal technique for this mine, we cannot say that the trial judge's finding of full cash value is deficient on that basis. To paraphrase the testimony of one of the expert witnesses who did not favor the cost approach in the valuation of a producing mine, what has been put into the mine is not too important; what is important is what can be gotten out of the mine in the future by way of profits.[8]

■ After considering all the appraisal evidence and the testimony of the expert appraisal witnesses, the trial judge concluded that the market data and cost approaches were not appropriate for the valuation of Inspiration's producing mine. He made the following findings:

"Knowledgeable buyers of producing copper mines in the open market do not base their purchase decisions on the market data or cost approaches to value. Rather, knowledgeable purchasers in the open market for producing copper mines rely almost exclusively on the income approach.

"Therefore, the Court concludes that, in determining the full cash value of *this* mine for purposes of property tax valuation only some form of an income approach may be used." (Emphasis added).

From a factual standpoint, there is strong support in the record for the trial court's finding. In its answering brief Inspiration states that the Department offered no evidence that knowledgeable purchasers of producing mines in the open market use anything other than an income approach. The Department has not referred us to any evidence to the contrary. From a legal standpoint, although there are three generally recognized appraisal approaches, the

income, market data and cost methods, Arizona law clearly recognizes that the use of all three approaches may not be appropriate in particular circumstances, and that based upon the evidence presented there might well be instances where only one approach to value is appropriate. *See County of Maricopa v. Sperry Rand Corporation*, 112 Ariz. 579, 544 P.2d 1094 (1976); *Department of Revenue v. Transamerica Title Company, supra; see also, Trico, supra.* We therefore find no error in the trial judge's above-quoted findings.

## THE ESTABLISHMENT OF A NEW FULL CASH VALUE

■ We now turn to the Department's contention that there is no competent evidence to support the trial judge's establishment of a new full cash value of $28,874,-000 for Inspiration's mine. The trial judge's findings did not identify any specific appraiser as being the sole source of the new full cash value which he established. However, since the amount of the valuation is the same as that testified to by Inspiration's expert appraisal witness Richard Nichols, we will assume that the trial judge relied primarily on Nichols' appraisal testimony.

The Department contends that Nichols' testimony was not competent because in making his appraisal he used a 10 year life rather than a 20 year life for the mine. It is true that Nichols based his appraisal on a 10 year income stream and there is substantial evidence in the record to the effect that the estimated life of the Inspiration Mine was 20 years. However, in order to properly evaluate the importance of the Department's contention, an understanding of the "life of the mine" concept is essential.

From the evidence presented in this case it is apparent that the determination of the life of a mine is a flexible, ever-changing, and indefinite estimation, especially when

---

8. An actual example given in testimony at the trial related to a joint venture composed of Hecla Mining Company and El Paso Natural Gas Company which put an investment of $198,-000,000 in their 1977 opening of the Lake Shore Mine near Casa Grande, Arizona. In 1979, notwithstanding the enormous investment, the mine was closed and the assets were sold for $9,163,000.

dealing with a large, low-grade ore body such as Inspiration's mine. Peter Steen, President and Chief Executive Officer of Inspiration pointed out that in considering the life of the Inspiration Mine, a distinction had to be made between geological ore reserves and mineable reserves. There is abundant testimony in the record that based upon projected mining activity, the geological reserve would support an estimate of a 20 year life for the mine, and Steen concurred in that estimate. Mineable reserve, however, is that portion of the geological reserve that can be mined at a profit. Naturally, therefore, it is affected by economic conditions. It is the mineable reserve which finally determines the life of a mine.[9]

Steen testified concerning Inspiration's ten year economic or financial plan which was used by Nichols in arriving at his estimation of value. Subsequently the Department's counsel questioned him: "I think you testified yesterday on the life of the mine. I believe you talked about a 10-year life. What is that 10-year life that you were talking about?" In response to this question and subsequent questions along the same line, Steen's testimony was to the effect that the economic life of the mine (the mineable reserve) was very dependent on a number of factors which constitutes a risk which is often taken in the mining industry. Such risks involve whether there will be a substantial future market or demand for copper in view of rising competition from other products such as the increased use of fiber optics which could erode the market. Another risk involves the future price of copper, a prediction of which, according to Steen "is a very precarious thing to have to do." In view of the uncertainty of these factors, and considering the particular ore body involved, it was Steen's opinion that a projection of

mining activity for this mine on a profitable basis beyond 10 years was not a sensible thing to do.

When appraiser Nichols was questioned concerning his use of a projected 10 year income stream as the basis for his discounted cash flow analysis, his response was to the effect that in view of the future uncertainties and unknowns, a 10 year forecast was the more appropriate method because that was the best that was known. As to possible additional values based upon a projection of the income stream beyond 10 years, he stated: "I still have the doubt in the back of my mind that if the whole thing doesn't work [10] then the values that I've already stated, I think, are relatively high." In response to cross-examination, however, he did state that if it were assumed that the same conditions would continue to exist for an additional 10 years, that would result in an increase in his valuation of about $3,300,000.

The Department's challenge of the competency of Nichols' testimony presents a close question when considered against the background testimony regarding the estimated 20 year life of the mine, including Inspiration's own representation in its tax report to the Department. On the other hand, it is apparent from the above discussion that while the estimate of a 20 year life based upon geological reserves might be predictable with relative certainty, the predictability of the mine's life based upon mineable reserves was much less certain. Additionally, we consider that Nichols' appraisal was not based directly upon a "life of the mine" concept, but rather upon a stream of future income which could be predicted with enough certainty to justify in his mind as an expert appraisal witness an assignment of value thereto.

9. This same concept is sometimes expressed by the terms "mineralized rock" as opposed to "ore." Ore (mineable reserve) is that portion of the mineralized rock (geological reserve) which can be economically mined with a resulting profit.

10. Nichols' reference to the "whole thing" appears to be a reference to Inspiration's new ferric cure process and the company's 10 year financial plan which envisioned the expenditure of some $310,000,000 in capital funds in order to meet the future stream of income goals upon which he based his analysis.

When the trial judge made his decision establishing the new full cash value of $28,874,000, he had before him not only Nichols' testimony, but also the valuation testimony of Greenfield ($26,734,000), O'Neil ($29,053,000), Guderjahn ($27,000,000) and Hawkins ($31,000,000). The trial judge was the trier of fact as to the establishment of a new full cash value and accordingly we must consider all of the evidence in a light most favorable to his determination of that issue. Considered in that light, we cannot say that Nichols' testimony as to value was not competent. Rather, the Department's arguments go only to the weight of that evidence. The true perspective for reviewing the trial judge's decision in this matter was best summarized (unwittingly) by the Department in its reply brief discussing the reduction of the full cash value by the trial judge: "The Department is confident that the court, upon full review of this matter, *will find that reasonable minds differ*, and that the determination of value made by Judge Strick should be reversed." (Emphasis added). We do find that reasonable minds could differ as to the weight to be given to the testimony relating to the full cash value of Inspiration's mine. That conclusion, however, does not lead to a reversal. Rather, since reasonable minds could differ the decision of the trial judge as the trier of fact in this *de novo* review must be affirmed.

Summarizing, for ease of analysis, we have discussed in separate sections of this opinion the evidence which we deemed particularly pertinent to rebutting the statutory presumption, showing that the Department's valuation was excessive and establishing a full cash value. Although these are separate and distinct legal requirements imposed on the taxpayer, in a practical sense the same evidence which tends to rebut the statutory presumption will often be relevant in establishing that the valuation was excessive, as well as furnishing a basis for the eventual determination by the trial judge of a new full cash value. Therefore, in arriving at a final determination of the sufficiency of the evidence to support the trial judge's holdings on those

issues in this case, we have considered the totality of the evidence and find substantial support for affirmance of his conclusions. We now turn to issues raised by the Department concerning the fees and costs awarded to Inspiration.

## FEES AND COSTS

After the trial judge entered his decision on the merits, a hearing was held on Inspiration's request for expert witness fees, expenses and attorney's fees pursuant to A.R.S. § 12–348. The trial judge awarded Inspiration costs, expenses and fees in the following amounts:

| | |
|---|---|
| Expert witness fees | $ 67,443.63 |
| Expenses | 17,434.46 |
| Attorney's fees (including paralegal and litigation assistance fees) | 155,691.50 |

■ On appeal the Department first contends that A.R.S. § 12–348 does not encompass property tax appeals pursuant to A.R.S. §§ 42–151 and 42–152. The contention is without merit.

The pertinent provisions of A.R.S. § 12–348 are as follows:

"(A) In addition to any costs which are awarded as prescribed by statute, a court shall award fees and other expenses to any party other than this state which prevails by an adjudication on the merits in any of the following:

\*   \*   \*   \*   \*   \*

"(2) A civil action brought by the party against the state to challenge the assessment or collection of taxes.

"(3) A court proceeding to review an agency decision, pursuant to title 12, chapter 7, article 6, or any other statute authorizing judicial review of agency decisions. (Footnote omitted).

\*   \*   \*   \*   \*   \*

"(G) As used in this section:

"(1) 'Fees and other expenses' includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test or

project which is found by the court to be necessary for the preparation of the party's case and reasonable and necessary attorney fees, and in the case of an action to review an agency decision pursuant to subsection A, paragraph 3, all such fees and other expenses incurred in the contested case proceedings in which the decision was rendered.

\* \* \* \* \* \*

"(3) 'State' means this state and any agency, officer, department, board or commission of this state."

The Department's argument, based upon a supposed analogy to federal statutory provisions, that the statute is limited to *income* taxes and cannot apply to the property tax valuation issues involved in this case is specious. Valuation is an integral part of the assessment process. The provisions of subsections (A)(2) and (A)(3) of the statute are unambiguous and directly applicable to property tax valuation issues raised pursuant to §§ 42–151 and 42–152. The trial judge did not err in finding that A.R.S. § 12–348 applied in this case.

■ The Department next contends that if A.R.S. § 12–348 applies, Inspiration is entitled to be reimbursed for only those attorney's fees incurred after the statute became effective on July 25, 1981. To say that the Department's arguments in support of this contention are confusing is to give the Department the benefit of the doubt. A.R.S. § 12–348 was added by Laws 1981, Ch. 208. Sessions Laws, Sec. 3, Chapter 208 provides that:

"Sec. 3. Applicability

"This act applies to any civil action or court proceeding pending on the effective date of this act except where a court of record has made a determination on the merits, regardless of whether final

judgment has been entered, and to any civil action or court proceeding which is commenced on or after the effective date of this act."

There is no contention that this action was not pending in the trial court on the effective date of A.R.S. § 12–348 or that the court had made a determination on the merits prior to that date. In view of the express provisions of § 3 of the Act, the retroactivity principles set forth in *Bouldin v. Turek*, 125 Ariz. 77, 607 P.2d 954 (1979) are simply not applicable. The language of § 3 making A.R.S. § 12–348 applicable to pending proceedings is an express declaration of legislative intent of retroactivity, and thus there is no violation of A.R.S. § 1–244.

The Department contends that since Inspiration had already commenced this action prior to the effective date of the statute and thus had not been "deterred" from contesting the Department's action, somehow § 1 of Ch. 208, the purpose section of the legislation, overrules the clear intent of § 3.[11] We find no merit in this argument. The language of § 3 clearly makes the statute applicable to fees incurred in cases pending prior to the effective date of the statute. *See Marlar v. State*, 136 Ariz. 404, 666 P.2d 504 (App.1983).

■ The Department next contends that in any event Inspiration was not entitled to attorney's fees or costs incurred relating to the hearing before the Board of Property Tax Appeals. A.R.S. § 12–348(A)(3) authorizes the payment of "fees and other expenses" to the prevailing party other than the state in a court proceeding "to review an agency decision" pursuant to any statute authorizing review of agency decisions. The Department's first argu-

---

11. Section 1 of Ch. 208 reads as follows:

"Section 1. Legislative findings; purpose

"A. The legislature finds that certain individuals, partnerships, corporations and labor or other organizations may be deterred from seeking review of or defending against unreasonable governmental action because of the expense involved in securing the vindication of their rights. The economic deterrents to contesting governmental action are magnified in these cases by the disparity between the resources and expertise of these individuals and their government.

"B. The purpose of this section is to reduce the deterrents and the disparity by entitling prevailing parties to recover an award of reasonable attorney fees, expert witness fees and other costs against the state."

ment appears to be that since A.R.S. §§ 42–151 and 42–152 provide for a trial *de novo*, an appeal proceeding pursuant to those statutes cannot be considered as a "review" of an agency decision.

This argument is not persuasive. A.R.S. § 42–146(A) provides that any taxpayer dissatisfied with the valuation of his property as reviewed by the State Board of Tax Appeals "may appeal to the superior court in the manner provided by § 42–151 and not otherwise." A.R.S. §§ 42–151 and 42–152 both specifically refer to the court proceedings as an "appeal." The obvious purpose of an appeal is to "review" the decision being appealed. *See, e.g.,* A.R.S. § 12–2102(A). The characterization of the review as constituting a trial *de novo* does have relevance to the scope of review, but it does not change the essential character of the proceeding as an appeal. Since a court proceeding pursuant to A.R.S. § 42–151 clearly constitutes a review of an agency decision, and under A.R.S. § 12–348(A)(3) the prevailing party in the court proceeding is entitled to recover "fees and other expenses," we need look no further than the definition of "fees and other expenses" as set forth in A.R.S. § 12–348(G)(1) for direct authority for the payment to Inspiration of the fees and expenses incurred by it in the proceedings before the State Board of Tax Appeals.

A.R.S. § 12–348(G)(1) provides in pertinent part:

"1. 'Fees and other expenses' includes ... in the case of an action to review an agency decision pursuant to subsection A, paragraph 3, all such fees and other expenses incurred in the contested case proceedings in which the decision was rendered."

Pursuant to the foregoing definition Inspiration was entitled to recover the fees and other expenses incurred in the contested proceedings before the State Board of Tax Appeals.

■ The Department's final contention is that the trial judge abused his discretion in determining the amounts awarded for fees and costs. The first part of the Department's argument on this issue concerns the amount awarded to Inspiration for expert witness fees. Without referring to any specific statutory provision, the Department in its opening brief states that "the statute limits the expert witness rates to the state's rates which here are $24,-026." In its reply brief the statute is identified as A.R.S. § 12–348(D)(1) with the statement that the statute "requires that the fees not exceed those paid by the state." The argument is without merit.

A.R.S. § 12–348(D)(1) provides:

"(D) The court shall base any award of fees as provided in this section on prevailing market rates for the kind and quality of the services furnished, except that:

"(1) An expert is not eligible for compensation at a rate in excess of the highest rate of compensation for experts paid by this state."

This statute does not say that a party's expert witness may not be compensated in an *amount* in excess of the *amount* paid to the state's experts. Rather, the limitation is on the *rate* of compensation. Under the statute the other party's experts may not be compensated *at a rate* in excess of the highest rate of compensation paid for the state's experts. That the use of the word "rate" is not a reference to the total amount of compensation paid becomes apparent when consideration is given to the provisions of subsection (C) which require that an application for fees set forth "the amount sought, including an itemized statement from the ... experts stating the actual time expended ... and the *rate* at which the fees were computed." (Emphasis added).

The Department has presented no information to this court concerning the rates at which any of the expert witnesses were paid. We therefore have no basis upon which to find a violation of the statute in the trial judge's award of expert witness fees in this case.

■ Concerning the amount of the award for attorney's fees, the Department

argues that the reasonable award for attorney's fees would be more closely "akin" to the amount allegedly incurred by the state, $32,136, and that somehow the fees are per se unreasonable because Inspiration was represented by "a large corporate" law firm. Additionally, the Department contends that "there were double billings, erroneous inclusions, items were sometimes lumped together with one statement of time, and extravagant meals." All of the foregoing allegations are made without reference to the record or any factual detail as to the specific amount or specific items which are claimed to be excessive or not reimbursable. Under such circumstances, this court is not obligated to search the record to determine whether there is any basis for the claims raised by the Department. *See Yoo Thun Lim v. Crespin,* 100 Ariz. 80, 411 P.2d 809 (1966); *Milam v. Milam,* 101 Ariz. 323, 419 P.2d 502 (1966). Accordingly we find no abuse of discretion by the trial judge in setting the amounts of attorney's fees, expert witness fees, costs and expenses in this matter.

The judgment entered by the trial court is affirmed.

BROOKS and KLEINSCHMIDT, JJ., concur.