IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

MESQUITE POWER, LLC, *Plaintiff/Appellee,*

*v.*

ARIZONA DEPARTMENT OF REVENUE, *Defendant/Appellant.*

No. 1 CA-TX 22-0002
FILED 12-20-2022

Appeal from the Arizona Tax Court
No. TX2018-000928
The Honorable Danielle J. Viola, Judge

**VACATED AND REMANDED WITH INSTRUCTIONS**

COUNSEL

Mooney, Wright, Moore & Wilhoit, PLLC, Mesa
By Paul J. Mooney (argued) and Bart S. Wilhoit
*Counsel for Appellee*

Arizona Attorney General's Office, Phoenix
By Lisa Neuville (argued) and Kimberly Cygan
*Counsel for Appellant*

**OPINION**

Judge Paul J. McMurdie delivered the Court's opinion, in which Presiding Judge Brian Y. Furuya and Judge Jennifer B. Campbell joined.

**M c M U R D I E**, Judge:

¶1        The Arizona Department of Revenue ("Department") appeals from the tax court's judgment reducing the full cash value of property held by Mesquite Power, LLC ("Mesquite") for the 2019 tax year. The Department argues the tax court erred by (1) discounting the impact of an established power purchase agreement on the property's value and (2) considering incompetent expert testimony.

¶2        We hold that where intangible assets enhance the real and tangible property's value, a competent appraisal must consider the effect such intangible assets have on the taxable property's value. Thus, we vacate the judgment, vacate the award of attorney's fees, costs, and expenses, and remand for the court to affirm the statutory value found by the Department.

## FACTS AND PROCEDURAL BACKGROUND

¶3        The heart of this dispute is Mesquite's power plant's full cash value assessment for the 2019 tax year. At issue is whether the existence of an intangible agreement enhances the value of the real and tangible personal property subject to the tax assessment.

### 1.    Mesquite's Power Plant.

¶4        Mesquite's power plant is one-half of a two-block, combined-cycle, natural gas-fired electric generation facility in western Maricopa County. It operates as a "base load plant," meaning it runs continuously. The plant sells the electricity it generates on the open market as a "merchant plant."

¶5        A power plant's capacity is measured in megawatts. The plant has a nameplate capacity of 691.6 megawatts and a net operating capacity of 625 megawatts. Another metric, called "heat rate," confirms how efficiently a plant converts fuel into energy. The plant's historical heat rates are superior to the average for comparable facilities in the region and across the United States.

### 2.    Transaction History.

¶6        Sempra U.S. Gas & Power ("Sempra") built the plant in 2003. Sempra structured the plant and its accompanying business as Mesquite. In 2015, Sempra sold Mesquite to ArcLight Capital Partners, LLC ("ArcLight") for nearly $357 million.

¶7          ArcLight spent over $27 million in capital improvements for the plant. In December 2017, less than a month before the January 1 valuation date[1] for the 2019 tax year, ArcLight solicited offers for the sale of Mesquite. Southwest Generation Operating Company ("Southwest") first offered $518 million, and the deal closed in July 2018 for around $556 million. Southwest currently owns Mesquite.

### 3.      The Purchase Agreement.

¶8          Southwest's purchase of Mesquite from ArcLight included transferring a contract for power generation ("Purchase Agreement"). Under the Purchase Agreement, Mesquite guaranteed the Southwest Public Power Resources Group ("SPPR") access to 271 megawatts of electrical capacity until May 2021, when the capacity increased to 475 megawatts. In return, SPPR promised to pay Mesquite $34 million per year, rising to $48 million per year in 2022, as well as certain operation and maintenance costs for the plant. SPPR's payments are fixed whether SPPR draws upon any guaranteed electrical capacity. The terms of the Purchase Agreement run through 2046. Both before and after the purchase by Southwest, Mesquite remains bound by the Purchase Agreement.

¶9          The Purchase Agreement does not require that Mesquite provide electricity to SPPR from the Mesquite plant. If it chooses, Mesquite may purchase power on the open market to cover the capacity guarantee to SPPR. Although technically the Purchase Agreement and the plant are severable, any such severance would require approval by SPPR. According to Southwest's vice president, the presence of the Purchase Agreement was a deciding factor in purchasing the property.

### 4.      Litigation History.

¶10          This is not the first time Mesquite has appeared before the tax court. While still under the ownership of ArcLight, Mesquite challenged the Department's valuation of the property for the 2016 and 2017 tax years. The tax court issued a consolidated judgment in Mesquite's favor, establishing reduced property values for those years and finding that the Purchase Agreement was a "non-taxable, intangible asset." The Department did not appeal that judgment.

---

[1]          A.R.S. § 42-14153(C) provides that a property's value is the value "determined as of" the valuation date. *Siete Solar, LLC v. Ariz. Dep't of Revenue*, 246 Ariz. 146, 150, ¶ 17 (App. 2019).

¶11 In this case, the Department valued the property for the 2019 tax year at $196 million ("statutory value"). Mesquite appealed that assessment to the tax court, claiming that the statutory value exceeded the property's market value in violation of A.R.S. § 42-11001(6). Mesquite argued that the property's full cash value should be reduced to $105 million.

¶12 Before the tax court, Mesquite moved for partial summary judgment on whether the Purchase Agreement could be considered in the property's valuation. Mesquite asserted that the 2016–17 rulings estopped the Department from considering the Purchase Agreement. The Department, in turn, argued that while the Purchase Agreement was not taxable, its existence enhanced the value of the taxable property and should be considered in determining value. The tax court entered partial summary judgment for Mesquite, ruling that the Purchase Agreement is a "non-taxable, intangible asset that is separate and severable from the tangible property." The court partially denied the motion about "whether cash flows attributable to the Purchase Agreement can be considered as part of the valuation of Mesquite's property." The court did not address the cash flow issue in its final judgment.

¶13 At trial, Mesquite offered expert testimony supporting its $105 million evaluation claim. The Department offered expert testimony valuing the property at $432 million. Each expert considered the three standard appraisal methods (market,[2] income, and cost), although Mesquite's expert gave no weight to the cost or market approaches. Only the Department's evaluation included the "cash flows attributable" to the Purchase Agreement. Mesquite's expert, instead, constructed a hypothetical income model that excluded the Purchase Agreement income.

¶14 After a five-day bench trial, the tax court ruled for Mesquite, valuing the property at $105 million for the 2019 tax year. The Department appealed, and we have jurisdiction under A.R.S. §§ 12-2101(A)(1) and 42-1254(D)(4).

---

[2] In the tax court, the parties called the market approach the "sales comparison" approach, we apply the terminology found in A.R.S. § 42-16051(B)(1)–(3). *See Maricopa County v. Sperry Rand Corp.*, 112 Ariz. 579, 581 (1976).

## DISCUSSION

¶15　　　　"We view the facts in the light most favorable to sustaining the trial court's judgment." *Cimarron Foothills Cmty. Ass'n v. Kippen*, 206 Ariz. 455, 457, ¶ 2 (App. 2003) (quoting *Sw. Soil Remediation, Inc. v. City of Tucson*, 201 Ariz. 438, 440, ¶ 2 (App. 2001)). We will "defer to the trial court's factual findings as long as the record supports them." *In re the Gen. Adjudication of All Rts. to Use Water in the Gila River Sys. & Source*, 198 Ariz. 330, 337, ¶ 15 (2000). We review pure questions of law and mixed questions of law and fact *de novo. See Robson Ranch Mountains, LLC v. Pinal County*, 203 Ariz. 120, 125, ¶ 13 (App. 2002).

¶16　　　　When challenging the statutory value, the taxpayer must rebut the statutory presumption and show that a lower valuation is correct. *See Graham County v. Graham County Elec. Coop., Inc.*, 109 Ariz. 468, 469–70 (1973).

¶17　　　　Arizona values property at its "full cash value" for tax purposes. *Bus. Realty of Ariz., Inc. v. Maricopa County*, 181 Ariz. 551, 553 (1995). "Full cash value" generally means "fair market value," defined as "that amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." *Id.* Fair market value can be derived by using "standard appraisal methods and techniques." A.R.S. § 42-11001(6).

¶18　　　　"Current usage shall be included in the formula for reaching a determination of full cash value." A.R.S. § 42-11054(C)(1). "The valuation of electric generation facilities," like the property here, is determined by looking at, among other things, "[t]he value of land, . . . . [t]he valuation of real property improvements used in operating the facility, . . . . [and the] valuation of personal property used in operating the facility." A.R.S. § 42-14156(A)(1)–(3). "'Personal property' means all tangible property except for land and real property improvements." A.R.S. § 42-14156(B)(2).

## A.　　Mesquite Misattributes Value to the Purchase Agreement.

¶19　　　　The parties agree that Southwest bought Mesquite—including real and personal property and the Purchase Agreement—for about $556 million. Mesquite's expert appraised the tangible property at $105 million. Though there was no appraisal for Mesquite's intangible property, it follows from the sale price that, as of the time of Southwest's purchase, Southwest valued Mesquite's intangible

property (which includes the Purchase Agreement) at more than $400 million.

¶20  Although Mesquite did not separately appraise the value of the Purchase Agreement, the Department argues that the Purchase Agreement has little to no independent value. The Department also contends, however, that the Purchase Agreement's presence enhances the value of the real and tangible property of the plant.

¶21  The Purchase Agreement is a contract to provide electricity to SPPR in exchange for SPPR paying Mesquite a fixed annual rate and operational costs. But the Purchase Agreement itself does not represent or evidence the value of these transactions. If the Purchase Agreement no longer existed, it would change nothing about the plant or its ability to produce the same electrical capacity. So long as the plant can produce electricity, a new sale agreement could be negotiated with SPPR or any other willing purchaser. The plant's electricity production generates value no matter how the sale of that electricity is made or who is purchasing the electricity.

¶22  Still, Mesquite argues that the Purchase Agreement has independent value because, under the agreement, Mesquite will be paid no matter if SPPR chooses to take any electrical power. This argument is not persuasive. SPPR's choice to obtain power under the Purchase Agreement is irrelevant because Mesquite's obligation to guarantee power under that agreement persists. Any income Mesquite receives under the Purchase Agreement is *earned* by ensuring SPPR has *access* to the specified capacity. That Mesquite may or may not need to use the plant to satisfy its obligations under the Purchase Agreement does not alter the reality that electricity can be produced and sold by the plant, much less the circumstances of actual use relevant during the valuation period. And if the income must yet be achieved through performance under the contract, the value of the income is not inherent to the contract.

¶23  This is not to say that a contract can never hold value. For instance, a contract may have inherent value if its terms are favorable such that the bargained-for return is worth more than the consideration would secure on the open market. But the tax court did not make such a finding. If anything, the Purchase Agreement provides the best evidence for the fair market value of Mesquite's obligation, as the agreement was entered at arm's length.

¶24        Finally, even if the Purchase Agreement holds some value, Mesquite has failed to show that the inherent value of the Purchase Agreement explains the $400 million gap between the purchase price and the claimed property value. We thus conclude that Mesquite misattributes the value of the taxable property to the Purchase Agreement.

**B.        The Purchase Agreement Enhances the Value of the Taxable Property.**

¶25        Mesquite maintains that because the Purchase Agreement is a "non-taxable, intangible asset that is separate and severable from the tangible property," it cannot be considered in determining the property's tax valuation. In its appraisal, Mesquite's expert excluded the income generated under the Purchase Agreement and declined to factor the Purchase Agreement into Mesquite's risk assessment. As a result, Mesquite's appraisal for $105 million hinged on hypothetical cash flows and risk as if the Purchase Agreement did not exist.

¶26        Among other criticisms, the Department argues that Mesquite's appraisal is flawed because the Purchase Agreement contributes to the cash flow of the taxable tangible property. It also claims that the Purchase Agreement's income guarantee reduces the risk of operating the plant. The Department asserts that the Purchase Agreement's inherent value may be non-taxable, but to appraise the property as if the Purchase Agreement did not exist would artificially reduce the value of the taxable property and be error.

¶27        As a matter of mixed fact and law, we review *de novo* whether an appraisal technique is proper under standard appraisal methods. *See Eurofresh, Inc. v. Graham County*, 218 Ariz. 382, 387, ¶ 23 (App. 2007). As applied here, we address whether a tax valuation of real and personal property should consider intangible assets.

¶28        *Maricopa County v. Viola*, a case involving apartments participating in the low-income housing tax credits ("LIHTC") program, is instructive. 251 Ariz. 276 (App. 2021). Under the LIHTC program, property owners received federal tax credits for agreeing to thirty-year restrictions on the rent they can charge tenants. *Id.* at 278, ¶ 2. The tax court found this agreement intangible and untaxable. *Cottonwood Affordable Hous. v. Yavapai County*, 205 Ariz. 427, 429 (Ariz. Tax Ct. 2003).

¶29        We affirmed the tax court's ruling through special action and held that the LIHTC program must be considered when valuing property subject to the restrictions. *Viola*, 251 Ariz. at 281, ¶ 19. We explained that

"[a]n LIHTC property cannot be valued as if it were a conventional apartment complex because it is not and cannot be used as such." *Id.* at 280, ¶ 15. This holding reflects the statutory requirement that "[c]urrent usage" be considered in reaching the formula for full cash value. A.R.S. § 42-11054(C)(1). We agreed with the tax court's conclusion:

> A willing buyer, knowing that there is a restriction as to the amount of rent that can be charged, would pay less for a low income housing project than for a regular commercial apartment complex. This property should not be valued as though a buyer would not consider the restrictions. A valuation for an LIHTC project, determined under any of the standard appraisal methods, that does not take the deed restrictions into account will not result in a determination of fair market value for that property.

*Id.* at 279–80, ¶ 13 (quoting *Cottonwood Affordable Hous.*, 205 Ariz. at 430). Thus, while the LIHTC restrictions were not taxable property, it would be error to evaluate the apartments without considering their effect on the property.

¶30 Parallel reasoning applies here to the Purchase Agreement and the Mesquite plant. True, the Purchase Agreement raises rather than lowers the value of the business. That said, a willing buyer would still consider the Purchase Agreement's impact on the plant. Southwest's vice president affirmed this by testifying that Southwest would have never bought Mesquite's business without the Purchase Agreement. Because the Purchase Agreement influences the purchase price a willing buyer would pay for the property (and, more basically, whether to buy the property), the proper valuation of the property should reflect the effect of the Purchase Agreement. *See Viola*, 251 Ariz. at 279–80, ¶ 13.

¶31 Mesquite argues that it would be improper to consider the Purchase Agreement's enhancement of the value of the taxable property because the Purchase Agreement is "separate and severable from the tangible property." Mesquite maintains that because the tax court granted partial summary judgment on the issue and it was not appealed, the Department cannot contest the Purchase Agreement's separate and severable status.

¶32 But the Purchase Agreement's severability does not resolve whether it enhances the value of real and tangible property. The Purchase Agreement is severable, but it has not been severed. An asset that may be

removed from the property does not exempt it from taxation. A contrary view would defeat the purpose of including "personal property" in the valuation statute. *See* A.R.S. § 42-14156(A)(3). And more importantly, A.R.S. § 42-11054(C)(1) directs that tax evaluations be based on the property's "[c]urrent usage," not hypothetical usage.

¶33 Severable as it may be, the Purchase Agreement is not easily disentangled from the plant. The two were transferred together in the sale from ArcLight to Southwest. The terms of the Purchase Agreement require a supermajority buyer's approval to sell or transfer the Purchase Agreement independently, and Mesquite presented no examples of contracts like the Purchase Agreement being sold on the market separately from power plants. The Purchase Agreement provides operation and maintenance payments for Mesquite. We reject any suggestion that an agreement that offers, among other things, payment of operation and maintenance costs is not directed toward the operation or maintenance of the facility and can be ignored in an income-approach valuation.

¶34 Finally, the Purchase Agreement is not a unique or exclusive method for selling electrical power. Both parties presented evidence that most power plants not owned by a utility company operate and receive income through long-term contracts. Yet Mesquite's expert eliminated the revenue generated under the Purchase Agreement in his appraisal because the contract produced it. Taken to its extreme, such an approach would conclude that fully-subscribed power plants hold *no* value. Such a view defies reason and economic reality. Mesquite may not avoid taxes by sequestering its value into an untaxable contract just because such a contract is hypothetically severable and independent of the property on which it depends for its relevance. To hold otherwise also would run contrary to A.R.S. § 42-14156.

¶35 We conclude that the Purchase Agreement enhances the value of Mesquite's taxable property because it contributes to the plant's cash flows and current usage. Thus, it must be considered in determining the property's value.

## C. Because Mesquite's Appraisal Failed to Evaluate the Property as It Exists, It Is Incompetent to Rebut the Statutory Presumption.

¶36 Generally, the tax valuation "as approved by the appropriate state or county authority is presumed to be correct and lawful." A.R.S. § 42-16212(B). The taxpayer may overcome this presumption by presenting competent evidence that the taxing authority's valuation is excessive.

*Inspiration Consol. Copper Co. v. Ariz. Dep't of Revenue*, 147 Ariz. 216, 219 (App. 1985). "Evidence is competent for the purposes of rebutting the statutory presumption and of showing that the Department's valuation was excessive when it is derived by standard appraisal methods and techniques which are shown to be appropriate under the particular circumstances involved." *Id.* at 223.

¶37            If the taxpayer uses a different valuation method than the taxing authority, it must establish that its approach was appropriate under the circumstances. *Inspiration Consol. Copper Co.*, 147 Ariz. at 219. Yet if the taxpayer and taxing authority use the same appraisal method "but differ as to the correct treatment of factors utilized in such method, the taxpayer's evidence is nevertheless competent and sufficient to overcome the statutory presumption." *Id.*

¶38            The experts for the Department and Mesquite considered the three standard appraisal approaches, though they "differ[ed] as to the correct treatment of factors" and the relative weights given each method. *See Inspiration Consol. Copper Co.*, 147 Ariz. at 219. The Department's expert gave some weight to each of the three approaches. By contrast, Mesquite's appraisal relied on the income-based approach, claiming it is the most relied on by buyers and sellers in the industry. This approach uses the projected future cash flows of the property to determine its present value.

¶39            But Mesquite did not calculate cash flows for the plant in its current usage. Instead, Mesquite only included income from what it considers the taxable property, constructing a hypothetical income model for the property as if the Purchase Agreement did not exist. Mesquite's model is improper because it envisions the plant operating in a way that is not its "[c]urrent usage." *See* A.R.S. § 42-11054(C)(1). Mesquite cannot, consistent with reality, be valued as a plant without an in-place agreement providing a fixed income. *See Viola*, 251 Ariz. at 280, ¶ 15. This error alone would render Mesquite's appraisal "[in]appropriate under the particular circumstances involved." *Inspiration Consol. Copper Co.*, 147 Ariz. at 223.

¶40            But we have more concerns with Mesquite's appraisal. For example, in calculating the weighted average cost of capital ("WACC") for its model, Mesquite's expert included a "small company size premium" and a "company-specific" risk factor. Mesquite added these two values

together under the label "additional risk factor" ("$R_u$").[3] The Department did not use either of these risk factors. The Department challenges the application of $R_u$, arguing that it is unjustified and that its two components are duplicative.

¶41　　　　We agree with the Department. The record offers no indication that the small company premium and the company-specific risk are not improperly duplicative. Mesquite's expert explained the small company premium at trial, testifying that small companies are "inherently more risky because of . . . size, lack of diversification, and the liquidity in general." But Mesquite's expert report justifies the company-specific risk in a single sentence, claiming that it "account[s] for the electrical generation industry, lack of diversification and illiquidity." When asked on direct examination whether applying the company-specific risk beyond the small company premium would be double counting, Mesquite's expert replied:

> It's not double counting because, again, we've got the risk associated with there being a company and diversification, right? We still have the unsystematic risk that's associated with—again, the fact that we don't have that diversification. We have a single asset, and more specifically, just the real and personal property of that asset.

¶42　　　　Despite the expert's nominal denial, the testimony fails to disprove the Department's accusation of double counting. The whole of Mesquite's evidence encompasses both the small company premium and the company-specific risk based on diversification and liquidity grounds. The use of two factors to account for the same risk is duplicative. Without contrary justification, the $R_u$ factor appears to be little more than an attempt to pad the numbers such that they arrive at Mesquite's preferred value. *See Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 339 (Del. Ch. 2006) ("[T]he company specific risk premium often seems like the device experts employ to bring their final results into line with their clients' objectives, when other valuation inputs fail to do the trick.").

¶43　　　　Moreover, the effect of $R_u$ on the overall valuation is immense. For instance, $R_u$ adds 10.37% to the rate of return on equity capital, more

---

[3]　　　　Mesquite applies the label "additional risk factor" to both the sum, $R_u$, and to the 5% company-specific risk factor which is a subcomponent of $R_u$. For clarity, we call the subcomponent the "company-specific risk" and the total 10.37% amount $R_u$.

than doubling the number it would otherwise be (and, incidentally, roughly doubling the number Southwest projected as a rate of return on equity when purchasing Mesquite). Removing $R_u$ and relying only on Mesquite's expert's numbers for every other step in the analysis would lead to a total valuation of over $230 million—a number greater than the statutory value. The wild disparity in these values is especially alarming given Mesquite's sparse justifications for incorporating both risk factors.

¶44        The Department also argues that the small company premium and company-specific risk factors cannot be competently applied without evidence to justify their use. The Department supports this position by citing an unpublished decision, *Transwestern Pipeline Company v. Arizona Department of Revenue*, No. 1 CA-TX 19-0006, 2020 WL 4529622 (Aug. 6, 2020) (mem. decision). In *Transwestern*, the Department appealed a tax court's judgment that adopted a taxpayer's WACC calculation for the 2016 and 2017 tax years. *Id.* at *2, ¶ 6. The taxpayer's expert appraisal included small company premiums and company-specific risk factors that, in total, did not exceed five percent. *Id.* at *3, ¶ 14.

¶45        The Department challenged the validity of the risk factors, arguing that "company-specific risks duplicate the risks already accounted for in the small-company risk premium and the industry beta." *Transwestern Pipeline Co.*, No. 1 CA-TX 19-0006, at *3, ¶ 15. The Department also argued that the risk factors were unjustified because

> there is no evidence in the record that Transwestern uniquely suffered from the identified company-specific risks . . . while other companies in the pipeline industry do not. . . . [Transwestern] failed to provide sufficient factual basis for the premium; either specific financial analysis to determine whether a company-specific risk premium is appropriate or the amount of such a premium.

*Id.* While the taxpayer argued that applying company-specific risks followed "standard appraisal method[s]," the Department countered that "the evidence must still show risks specific to the company, above general risks to the entire industry." *Id.* at *4, ¶ 16.

¶46        We agreed with the Department that there was insufficient evidence identifying risks specific to Transwestern above the general risk to the industry or risks common to all business ventures. *Transwestern Pipeline Co.*, No. 1 CA-TX 19-0006, at *5, ¶ 19. We vacated the part of the judgment adopting the taxpayer's WACC calculation, holding that "we

need not defer to the tax court's conclusion based on [Transwestern's] testimony when we cannot find competent record evidence that Transwestern specifically suffered from the specific risk factors accepted by the court." *Id.* at *4, ¶ 16; *see also Pima County v. Cyprus-Pima Mining Co.*, 119 Ariz. 111, 119 (1978) (The expert's capitalization method was not competent evidence when he departed from projected copper prices and failed to adjust for inflation.).

¶47        *Transwestern* follows holdings from other jurisdictions. *See Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1158 (Del. Ch. 2006) (Company-specific premiums should not be applied without justifying evidence.); *see also Minn. Energy Res. Corp. v. Comm'r of Revenue*, 886 N.W.2d 786, 793–94 (Minn. 2016) (Lack of evidentiary support for company-specific risk justifies a tax court's decision to exclude this factor.); *cf. Horn v. McQueen*, 353 F. Supp. 2d 785, 839 (W.D. Ky. 2004) (Appraisals must be "careful not to 'double-count'" by applying a company-specific risk, "especially as modified ... for smaller companies."). While a company-specific risk may apply in some cases, the choice to use and the value of such a factor must be supported by the evidence.

¶48        Here, the $R_u$ factor is more than double what it was in *Transwestern*. But there is no evidence in the record suggesting that Mesquite is inferior to similar plants. On the contrary, its heat rates are superior to nationwide and regional averages. There is also no evidence that Mesquite is riskier than similar plants. Over half of Mesquite's capacity is contracted through 2046, and Mesquite's expert testified that plants under a contract are less risky than those without an agreement. We conclude that Mesquite has failed to provide evidence to justify its use of the 10.37% $R_u$ factor. As a result, its inclusion was unreasonable and "[in]appropriate under the particular circumstances involved." *Inspiration Consol. Copper Co.*, 147 Ariz. at 223.

¶49        Lastly, we respond to the Department's suggestion that Mesquite must apply the unit principle. An appraisal using the unit valuation method would calculate the plant's total value as an operating unit and remove any untaxable assets' fair market value from the full value. The Department cites several cases from other jurisdictions that apply the unit principle. *See Elk Hills Power, LLC v. Bd. of Equalization*, 304 P.3d 1052 (Cal. 2013) (power plant); *RT Commc'ns, Inc. v. State Bd. of Equalization*, 11 P.3d 915 (Wyo. 2000) (telephone company); *In re Appeal of ANR Pipeline Co.*, 79 P.3d 751 (Kan. 2003) (natural gas pipeline).

¶50 The advantage of the unit principle is that it captures the value generated by the cooperation of mutually beneficial assets. In so doing, it considers the "[c]urrent usage" of the property. *See* A.R.S. § 42-11054(C)(1). Given the shortcomings in Mesquite's appraisal, we need not decide whether the unit valuation principle is appropriate here.

¶51 We hold that any valuation approach must appraise the operating unit by its current usage to be competent. Property appraisal evidence is only competent "when it is derived by standard appraisal methods and techniques which are shown to be appropriate under the particular circumstances involved." *Inspiration Consol. Copper Co.*, 147 Ariz. at 223. Though derived by nominally standard methods, Mesquite's appraisal is inappropriate under the circumstances because, by assuming the Purchase Agreement does not exist, it does not reflect the property as it is. Thus, Mesquite's expert testimony is incompetent to rebut the statutory presumption.

## CONCLUSION

¶52 We vacate the tax court's judgment and remand for the tax court to impose the statutory value. We vacate the tax court's award of attorney's fees, expert witness fees, and costs. We deny Mesquite's request for appellate attorney's fees, costs, and other expenses under A.R.S. § 12-348(B) because Mesquite did not prevail on the merits.



AMY M. WOOD • Clerk of the Court
FILED: AA